## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE SABA SOFTWARE, INC.  : **Consolidated**
STOCKHOLDER LITIGATION  : **C.A. No. 10697-VCS**


## MEMORANDUM OPINION


Date Submitted: February 17, 2017
Date Decided: March 31, 2017


Peter B. Andrews, Esquire and Craig J. Springer, Esquire of Andrews & Springer LLC, Wilmington, Delaware; Seth D. Rigrodsky, Esquire, Brian D. Long, Esquire, Gina M. Serra, Esquire, and Jeremy J. Riley, Esquire of Rigrodsky & Long, P.A., Wilmington, Delaware; and Brian J. Robbins, Esquire, Stephen J. Oddo, Esquire, and Nichole T. Browning, Esquire of Robbins Arroyo LLP, San Diego, California, Attorneys for Plaintiffs.

Gregory V. Varallo, Esquire, Robert Burns, Esquire, and Sarah A. Galetta, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware; Erik J. Olson, Esquire of Morrison & Foerster, LLP, Palo Alto, California; and Robert W. May, Esquire of Morrison & Foerster LLP, San Francisco, California, Attorneys for Defendants Shawn Farshchi, William V. Russell, Dow R. Wilson, William M. Klein, William N. MacGowan, Michael Fawkes, and Nora Denzel.

Brian C. Ralston, Esquire, Jordan A. Braunsberg, Esquire, and Christopher G. Browne, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware; Alan S. Goudiss, Esquire of Shearman & Sterling LLP, New York, New York; Alethea Sargent, Esquire and Tiana Peterson, Esquire of Shearman & Sterling LLP, San Francisco, California, Attorneys for Defendants Vector Capital Management, L.P., Vector Talent II LLC, and Vector Talent Merger Sub, Inc.


**SLIGHTS, Vice Chancellor**

This action arises out of the acquisition of Saba Software, Inc. ("Saba" or "the Company") by entities affiliated with Vector Capital Management, L.P. in an all-cash merger in which stockholders received $9 per share for their Saba stock (the "Merger"). The Plaintiff's Second Amended Verified Class Action Complaint (the "Complaint"), and its description of the unfortunate series of events leading up to the Merger, calls out to Samuel Barber's *Adagio for Strings* to set the mood for the final scene. According to the Securities and Exchange Commission ("SEC"), Saba, through two of its former executives, engaged in a fraudulent scheme from 2008 through 2012 to overstate its pre-tax earnings by $70 million. Thereafter, Saba repeatedly promised regulators, its stockholders and the market that it would get its financial house in order. Each promise included assurances to stockholders that Saba would restate its financial statements by a certain date. And each time Saba inexplicably failed to deliver the restatement by the promised deadline. When it failed to meet a deadline for filing its restatement set by the SEC, the SEC revoked the registration of Saba's common stock. Not surprisingly, the stock price suffered. In the midst of this chaos, the Company announced that "it was exploring strategic alternatives, including a sale of the Company."

When Saba's board of directors ultimately sought stockholder approval of the Merger, after a months-long sales process, the choice presented to stockholders was either to accept the $9 per share Merger consideration, well below its average trading

price over the past two years, or continue to hold their now-deregistered, illiquid stock. Not surprisingly, the majority of Saba's stockholders voted to approve the Merger.

Plaintiff, a former Saba stockholder, brings two claims: Count I alleges breach of fiduciary duty against the members of Saba's Board of Directors (the "Board") and Count II alleges aiding and abetting breach of fiduciary duty against the Vector-affiliated defendants. In this opinion, I conclude the Board may not invoke the business judgment rule under the so-called *Corwin* doctrine because the Complaint pleads facts that allow a reasonable inference that the stockholder vote approving the transaction was neither fully informed nor uncoerced. I also conclude that Plaintiff has pled a non-exculpated claim of bad faith and breach of the duty of loyalty by stating facts that support pleadings-stage inferences that the Board knowingly failed to disclose material information to stockholders and was motivated to approve the Merger so that its members could cash-in on equity options and restricted stock units that would otherwise have been illiquid as a consequence of the deregistration of the Company's stock. Plaintiff has failed, however, to state a claim for aiding and abetting breach of fiduciary duty against the Vector defendants because he has failed to allege sufficient facts to support a reasonable inference that Vector knowingly participated in the breach of fiduciary duty.

2

# I.   BACKGROUND

In considering this motion to dismiss, I have drawn the facts from the well-pled allegations of the Complaint, documents incorporated into the Complaint by reference, and judicially noticeable facts.[1]  As I must at this stage, I have accepted all well-pled facts in the Complaint as true.[2]

## A.  The Parties and Relevant Non-Parties

Plaintiff, Gary Poltash, was a stockholder of Saba at all relevant times who beneficially owned over 80,000 shares of Saba stock prior to the Merger.  He was appointed lead plaintiff in this consolidated class action on or about April 8, 2015.

Defendants, Nora Denzel, Shawn Farshchi, Michael Fawkes, William M. Klein, William N. MacGowan, William V. Russell and Dow R. Wilson (the "Individual Defendants") all served on the Board during the timeframes that give rise to Plaintiff's breach of fiduciary duty claims.  Farshchi also served as Saba's President and CEO, beginning in August 2013, after previously serving as Saba's Interim CEO from March 2013 to August 2013 and Executive Vice President and

---

[1] *Solomon v. Armstrong*, 747 A.2d 1098, 1126 n.72 (Del. Ch. 1999), *aff'd*, 746 A.3d 277 (Del. 2000).  Plaintiff referred to and relied upon Saba's Proxy Statement throughout the Complaint.  *See e.g.*, Compl. ¶¶ 45, 48 n.4, 90, 95 n.12, 99 n.13, 104.  Therefore, I have considered facts in the Proxy in addition to those alleged in the Complaint.  Transmittal Aff. of Robert L. Burns, Esq. in Supp. of Opening Br. in Supp. of Individual Defs.' Mot. to Dismiss ("Burns Aff.") Ex. 1 ("Proxy").

[2] *Id.*

3

Chief Operating Officer from June 2011 to August 2013. Fawkes was the Chairman of the Board's Corporate Governance and Nominating Committee and a member of the Strategic Committee. Klein also served on the Board's Strategic Committee and the Ad Hoc Transaction Committee (the "Ad Hoc Committee"). MacGowan served as Chairman of the Board's Compensation Committee. Russell was the non-executive Chairman of the Board, beginning in March 2013, and served on the Ad Hoc and Strategic Committees. Wilson was a member of the Ad Hoc Committee.

Defendant, Vector Capital Management, L.P., a Delaware limited partnership, is a private equity firm that manages over $2 billion in equity capital and focuses on value-oriented investments in technology companies. Prior to the Merger, Vector Capital Management, L.P. was one of Saba's lenders. Defendant, Vector Talent II LLC, is a Delaware limited liability company and affiliate of Vector Capital Management, L.P. Defendant, Vector Talent Merger Sub, Inc., a Delaware corporation, is wholly-owned by Vector Talent II LLC and an affiliate of Vector Capital Management, L.P. (collectively, with Vector Capital Management, L.P. and Vector Talent II LLC, "Vector" or the "Vector Defendants"). The Merger caused Saba to merge with Vector Talent Merger Sub, Inc. with Saba surviving as a wholly-owned subsidiary of Vector Talent II LLC.

Prior to the Merger, non-party Saba Software, Inc. was a Delaware corporation with its principal executive offices in Redwood City, California. Saba

provided "cloud-based human resources solutions, such as products and services for employee training, performance evaluations, employee planning, collaboration tools, succession planning and recruiting."[3] Saba's stock traded on the NASDAQ exchange until it was delisted on June 17, 2013. Thereafter, it was traded over-the-counter ("OTC") until it was deregistered by the SEC on February 19, 2015.

## B. The Financial Fraud and Failed Attempts to Restate Financials

As alleged in an SEC complaint filed against Saba and two of its former executives in September 2014, Saba's Indian subsidiary engaged in millions of dollars of financial fraud beginning in 2008 and ending in the second half of 2012. The fraud caused Saba to overstate its pretax earnings by $70 million from 2007 to 2011. After the fraud was uncovered, Saba continually assured its stockholders, regulators and the market that it would complete a restatement of its financial statements by dates certain. In each instance, without explanation, the Company would fail to file the restatements as promised. On April 9, 2013, NASDAQ suspended trading of Saba's shares due to Saba's ongoing failure to restate its financials. NASDAQ eventually delisted Saba on June 17, 2013. Saba's common stock then began to trade OTC.

---

[3] Compl. ¶ 26.

Saba announced that it had reached a settlement with the SEC regarding its financial fraud on September 24, 2014. The settlement provided that Saba would pay a $1.75 million civil penalty and "cease and desist from committing or causing future violations of [] the securities laws."[4] The settlement also required Saba to complete a restatement of its financials and file its Comprehensive Annual Report by February 15, 2015 (collectively, the "Restatement"). If Saba failed to complete the Restatement, the settlement provided that the SEC would deregister Saba's common stock pursuant to the Securities Exchange Act of 1934 § 12(j). When Saba announced the settlement, its then-CFO Mark Robinson stated: "We continue to anticipate filing the restatement in the fourth quarter of this calendar year [2014]."[5]

A few days after the announcement of the SEC settlement, Saba's stock was trading at $14.08 per share. In the wake of the settlement, an analyst at B. Riley & Co. reported: "We continue to believe an acquisition of the company, which we acknowledge could garner a healthy premium to our price target of [$14], is the likely endgame. Even so, such a scenario is unlikely to transpire before Saba regains compliance with the SEC and puts its longstanding accounting restatement in the rearview mirror."[6] Unfortunately, true to past form, on December 15, 2014, Saba

---

[4] Compl. ¶ 30.

[5] Compl. ¶ 32.

[6] Compl. ¶ 39.

6

announced that it would not complete the Restatement by the February 15, 2015 deadline and thereby ensured that the SEC would deregister Saba's stock in February 2015. This, in turn, would render the stock untradeable and essentially illiquid.

## C. Saba Pursues Strategic Alternatives Including a Sale

At the same time Saba delivered the news that it would fail to comply with the SEC's Restatement deadline, it also announced that it was "evaluating strategic alternatives, including a sale of the Company" and that it was engaging in "preliminary discussions with potential acquirers."[7] By the end of that day, Saba's stock price fell from $13.49 to $8.75 per share. Even so, on December 16, 2014, analysts at Craig-Hallum Capital Group LLC set a price target for Saba stock at $17 per share and gave it a "Buy" rating.

Saba had been open to exploring strategic alternatives, including a possible sale, since at least February 2011, and had retained Morgan Stanley to facilitate that process. Morgan Stanley's retention agreement was purely contingent; it provided that Morgan Stanley would be compensated $1,000,000 if Saba signed a merger agreement and 1.5% of the transaction price if a transaction was completed. Otherwise, there would be no compensation.

---

[7] Compl. ¶ 34.

The Strategic Committee of the Board, comprised of Russell, Klein and Fawkes, was created in August 2013 to "evaluate strategic alternatives and [] conduct negotiations with potential investors or acquirers."[8] From January to November 2014, Saba engaged in discussions with twelve parties regarding a possible sale, including private equity firms and other technology companies, but no deal came to fruition.

## 1. The Threat of Deregistration Fuels the Sales Process

By November 2014, Saba knew that it would not complete the Restatement in time to avoid deregistration. During a Board meeting on November 12, the Board and Saba management "discussed the difficulties that the [Company] was having in regaining compliance with the SEC requirements to restate financial statements and the risks presented to the Corporation as a result of those challenges."[9] On November 17, 2014, private equity firm Thoma Bravo, LLC, which had been engaged in negotiations with Farshchi about a possible acquisition of Saba since May 2014, submitted an oral indication of interest to acquire Saba at $11 per share.

On November 19, 2014, the Board met with representatives from Morgan Stanley and Morrison & Foerster LLP, Saba's legal counsel, to discuss the

---

[8] Compl. ¶ 36.

[9] Compl. ¶ 42 (internal quotation marks omitted).

Restatement and possible strategic alternatives. Morgan Stanley told the Board that it had approached eleven potential buyers, six had signed non-disclosure agreements, four had met with management but only Thoma Bravo had actually submitted any indication of interest. Morgan Stanley also told the Board that many parties had submitted feedback regarding their "concerns about the impact of the restatement and SEC regulations on consummating a timely transaction," and explained that these concerns were discouraging many potential buyers from submitting a bid.[10]

At the conclusion of the November 19 meeting, the Board formed the Ad Hoc Committee, with Russell, Klein and Wilson as members, to explore strategic alternatives, "provide additional oversight regarding the process of evaluating strategic alternatives" [11] and "ensur[e] that [the Company] ran a robust process."[12] While the Ad Hoc Committee was supposed to direct the sales process, it allowed Farshchi as CEO to communicate directly with interested parties, even on the subject of "his future employment and compensation" with potential acquirors.[13]

The Ad Hoc Committee was advised during its meeting on December 3, 2014, that the Restatement was unlikely to be completed in the first quarter of 2015. The

---

[10] Compl. ¶ 44 (internal quotation marks omitted).

[11] Compl. ¶ 45 (quoting Proxy at 26) (internal quotation marks omitted).

[12] Compl. ¶ 45 (internal quotation marks omitted).

[13] Compl. ¶ 48.

consequences of the failure to complete the Restatement on time were well known to all concerned. At this meeting, Morgan Stanley indicated that, at the Board's direction, Saba was "progressing toward a [] mid-December transaction signing with Thoma Bravo,"[14] even though the deal likely would come in below the current OTC market price and eliminate the possibility of upside that stockholders might achieve if Saba remained a standalone company. Morgan Stanley also advised the Ad Hoc Committee that by signing a deal before the deregistration date, Saba "would be able to consummate a transaction . . . [that] it may not normally be able to accomplish if it was still under the purview of the SEC."[15]

In early December, private equity firm Golden Gate Capital submitted its expression of interest in acquiring Saba at a price of $11–$12 per share. When the Board met again with representatives from Morgan Stanley and Morrison & Foerster on December 10, 2014, however, Morgan Stanley advised that Thoma Bravo was the only party interested in acquiring Saba and that the consideration it would offer would be below $9 per share. This drop in price was attributed, at least in part, to Saba's inability to complete the Restatement and concerns about the SEC's reaction to an acquisition. According to Morgan Stanley, no other parties were interested as

---

[14] Compl. ¶ 51.

[15] Compl. ¶ 52 (internal quotation marks omitted).

they would not be able to complete due diligence in the short time that remained before deregistration. Morgan Stanley also told the Board that all price feedback it had received was below the current market price. Finally, Morgan Stanley informed the Board that Vector would be interested in engaging in a go-shop if the Thoma Bravo final offer came in at less than $15 per share.

After the announcement on December 15, 2014 that Saba would be unable to complete the Restatement by the SEC's deadline, the Board directed Morgan Stanley to contact additional parties who may be interested in acquiring Saba.[16] On December 17, 2014, the Ad Hoc Committee was informed that one of Saba's current stockholders had indicated that it might be willing to provide additional funding to the Company on a standalone basis. The Ad Hoc Committee was also told that a group of Saba stockholders had expressed an interest in acquiring the Company at a price above $8–$9 per share, the latest range indicated by Thoma Bravo. There is no indication, however, that the Ad Hoc Committee followed up on either of these overtures. In total, Morgan Stanley contacted twenty-six parties by the end of December 2014, but no indications of interest remained extant by year-end other than Thoma Bravo's proposal at $8–$9 per share.

---

[16] Proxy at 29–30.

## 2. Vector Enters the Fray

Vector surfaced on January 15, 2015, with a written indication of interest to acquire Saba at $9 per share. As if on que, Saba then received written indications of interest from Golden Gate Capital, Sumeru Equity Partners L.P. and Silver Lake Partners working together and Thoma Bravo, as well as verbal indications of interest from H.I.G. Capital and Symphony Capital between January 15 and 16, ranging from $5.25–$9 per share.

Vector had a prior relationship with Saba as one of its lenders dating back to 2013. Most recently, Vector had provided Saba $15 million in debt financing on September 23, 2014, in addition to the $30 million of debt previously outstanding. In 2013, Vector engaged in due diligence of Saba in relation to a possible further debt financing transaction and therefore had access to Saba's recent and detailed financial information through that process. Morgan Stanley also had a prior relationship with Vector, having previously provided financing services to a Vector affiliate for which it had received fees. Additionally, it was disclosed to the Board that representatives of Morgan Stanley who were working with Saba on its sales process "may have committed and may commit in the future to invest in private equity funds managed by [Vector]."[17]

---

[17] Compl. ¶ 105 (quoting Proxy at 42).

On January 20, 2015, Saba issued a press release announcing its intention to enter into a definitive acquisition agreement prior to the February 15, 2015 Restatement deadline if the Board determined that pursuing a sale was in the best interests of the Company. Outside counsel provided drafts of a merger agreement to Vector's counsel on January 22, 2015. On January 23, 2015, however, Morgan Stanley informed the Board that more potential bidders had just signed non-disclosure agreements and that it was receiving interest from additional parties.

On February 2, 2015, Vector again submitted an indication of interest to acquire Saba at $9 per share. The OTC closing price for Saba's common stock on that day was $9.45 per share. Vector indicated that it would be able to execute the transaction agreements by February 6, 2015, and that it had completed its due diligence except for some confirmatory accounting and legal diligence. The proposal also indicated Vectors' intent to retain CEO Farshchi and Williams, who was Saba's Executive Vice President, General Counsel and Corporate Development officer, after the acquisition. The Ad Hoc Committee met with Morgan Stanley and Saba management on February 3, 2015 to discuss Vector's offer.

Beginning in October 2014, as part of the process of exploring strategic alternatives, Saba management created four sets of projections incorporating various assumptions about whether and when Saba would complete the Restatement and whether its stock would be deregistered. At its February 3, 2015 meeting, the Ad

13

Hoc Committee ultimately adopted scenarios reflecting the negative impact of deregistration on Saba stock and assumed that the Company would complete the Restatement in either August 2015 or December 2015. The Board then instructed Morgan Stanley to rely on this negative scenario for purposes of its fairness analysis. This, of course, resulted in the lowest valuation of Saba as among all of the scenarios created.

### 3. The Board Accepts Vector's Proposal

At the conclusion of the February 3 meeting, the Ad Hoc Committee decided to respond to Vector that day and ask for $9.25 per share. Vector responded that it would not pay more than $9 per share given the pending deregistration of Saba's shares. On February 4, 2015, the Ad Hoc Committee agreed to an exclusivity agreement with Vector at $9 per share, set to expire February 10, 2015. The Ad Hoc Committee also discussed Vector's desire to enter into new employment contracts with Farshchi and Williams as a condition of the Merger. During a February 6, 2015 meeting of the Board with representatives from Morgan Stanley and Morrison & Foerster, after determining that due diligence on the deal was "essentially complete, [the Board] authorized Farshchi and Williams to negotiate with Vector with regards to their post-merger employment."[18] Ultimately, the post-Merger company

---

[18] Compl. ¶ 71 (internal quotation marks omitted).

14

employed Farshchi and Williams on an at-will basis with a guarantee that their base salaries would not be reduced. They also retained "'the cash incentive compensation target amount opportunit[ies]'" and employee benefits "no less favorable" than those they had received from Saba prior to the Merger.[19]

The Board received Morgan Stanley's fairness opinion at a Board meeting on February 9, 2015. At this meeting, the Board also granted themselves equity awards that would be cashed-out upon consummation of the merger in place of "unvested, suspended, lapsed and/or cancelled equity awards," including those suspended, lapsed and/or canceled due to the Company's failure to complete the Restatement.[20] Having just approved cash consideration for their otherwise illiquid equity awards, the full Board then approved the Merger at $9.00 per share. That day, Saba stock closed at $8.94 per share.

On February 10, 2015, only five days before the Restatement deadline, Saba and Vector executed the Merger agreement at $9 per share and Saba issued a press release announcing the Merger. The Merger consideration constituted a 2% discount to the average stock price for the week prior to the announcement. On February 19, 2015, the SEC issued an order to deregister Saba stock under the Securities

---

[19] Compl. ¶ 99 (quoting Proxy).

[20] Compl. ¶ 73.

Exchange Act of 1934 § 12(g), meaning that the stock was ineligible for trading using means of interstate commerce and, therefore, essentially illiquid.

Because the stockholder vote was to take place after Saba's stock was deregistered, Saba was not required to submit its Proxy or GAAP financials for SEC review and was able, therefore, to accelerate the time from signing, to mailing of the Proxy, to stockholder vote. Saba mailed the Proxy to its stockholders on or about March 6, 2015, only twenty-four days after announcing the Merger. Twenty days later, on March 26, 2015, the Saba stockholders voted to approve the Merger. When asked to vote on the Merger, in the wake of deregistration, Saba stockholders were left with a choice either to accept the $9 per share offered through the Merger or hold onto their illiquid stock with no real sense of when or if that circumstance might change. While projections in the Proxy indicated that Saba would complete the Restatement in August of 2015, the stockholders also knew that Saba had failed to complete restatements of its financials on several occasions in the past despite assurances that various filing deadlines would be met. The Merger closed on March 30, 2015.

## D. The Equity Awards are Converted to Cash

The ongoing failure to restate its financials left Saba unable to award equity compensation to Board members, executives and employees. As noted, that changed on February 9, 2015, the day before the Company executed the Merger Agreement, when the Board approved changes to the compensation plan that allowed executives and Board members to receive cash payments in the form of synthetic options and synthetic Restricted Stock Units ("RSUs"), equal to the amount of their suspended equity awards. These cash payments were "contingent on the consummation of the [Merger] and certain other conditions."[21] In addition to the cash payments in lieu of suspended equity awards, the Saba Board also approved cash payments to executives whose equity awards were canceled or lapsed during the restatement process.

Through this process, Denzel, Fawkes, Klein, MacGowan, Russell and Wilson each were granted 10,000 RSUs and Williams was granted 63,000 RSUs. Further, the expiration of 15,000 stock options held by Wilson and 50,000 stock options held by Williams was rescinded, thereby allowing them to receive cash compensation in lieu of these awards upon consummation of the Merger. In addition to the grant of new options, all Saba options and RSUs that were vested and outstanding prior to the Merger (including those vested through acceleration or

---

[21] Compl. ¶ 90 (quoting Proxy).

17

otherwise due to the Merger) would be canceled and converted to cash payments upon completion of the Merger.  Based on these revisions to the compensation plan, the following payments were due to Board members and Saba executives as a result of the Merger:

| Name | Total Merger-Related Compensation |
| --- | --- |
| Shawn Farshchi | $2,828,050 |
| Peter Williams | $908,194 |
| William Russell | $270,000 |
| William Klein | $270,000 |
| William MacGowan | $270,000 |
| Nora Denzel | $270,000 |
| Michael Fawkes | $270,000 |
| Dow Wilson | $270,000 |

## II.    PROCEDURAL STANDARD

When considering a motion to dismiss:

(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'[22]

## III.    ANALYSIS

As noted, the Complaint is comprised of two counts: Count I alleges breach of fiduciary duty against the Individual Defendants and Count II alleges aiding and

---

[22] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted).

18

abetting that breach of fiduciary duty against the Vector Defendants. The Individual Defendants have moved to dismiss on three grounds. *First*, they contend that the Merger has been "cleansed" by a fully informed, uncoerced stockholder vote and therefore is subject to the business judgment rule. If the Court agrees, then the Merger would be assailable only for waste, which Plaintiff has not pled here. *Second,* they argue that Plaintiff's allegations regarding the failure to complete the Restatement state derivative claims that were extinguished in the Merger. *Third,* they maintain that any direct claims that might remain are exculpated by the Section 102(b)(7) provision in Saba's certificate of incorporation. Vector joins the Individual Defendants in these arguments, and asserts (correctly) that if there is no underlying breach, then Vector cannot be liable for aiding and abetting. Further, Vector argues that the aiding and abetting claim must be dismissed in any event because Plaintiff has not adequately pled a necessary element of the claim— knowing participation in the underlying breach of fiduciary duty.

I begin my analysis with the Individual Defendants' argument that a fully informed, uncoerced stockholder vote has cleansed any claim for breach of fiduciary duty stated in the Complaint. Because I have concluded that a cleansing vote did not occur here, I next take up the argument that Plaintiff's claims are derivative and therefore he lost standing to assert them after the Merger. Because I have concluded that Plaintiff has asserted direct, not derivative, claims that survive the Merger, I turn

19

next to the Individual Defendant's argument that Plaintiff has failed to plead non-exculpated claims against the Individual Defendants. Here again, I disagree and therefore deny the Individual Defendants' motion to dismiss. Finally, I address the aiding and abetting claim and conclude that Plaintiff has failed to state that claim as a matter of law.

## A. The *Corwin* Analysis

In *Corwin v. KKR Financial Holdings LLC*,[23] our Supreme Court held that when a "transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies."[24] This reasoning flows from Delaware's "long-standing policy . . . to avoid the uncertainties and costs of judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction for themselves."[25] The so-called *Corwin* doctrine, however, only applies "to fully informed, uncoerced stockholder votes, and if troubling facts regarding director behavior were not disclosed that would have been material to a voting stockholder, then the business judgment rule is not invoked."[26]

---

[23] 125 A.3d 304 (Del. 2015).

[24] *Id.* at 309.

[25] *Id.* at 313.

[26] *Id.* at 312.

Here, Plaintiff does not dispute that the majority of Saba's disinterested stockholders approved the Merger.[27] The inquiry, then, turns to whether the Plaintiff has pled facts from which one might reasonably conceive that the vote was not fully informed or was coerced.[28] If yes, then *Corwin* will not apply, the business judgment rule will not be available to the Individual Defendants at the pleadings stage and enhanced scrutiny will be the standard of review; if no, then the motion to dismiss must be granted because Plaintiffs have not alleged waste.[29]

### 1. Plaintiff has Adequately Pled that the Stockholder Vote was not Fully Informed

As noted, to overcome a *Corwin* defense, the "plaintiff challenging the decision to approve a transaction must first identify a deficiency in the operative disclosure document, at which point the burden would fall to defendants to establish

---

[27] *See* Compl. ¶ 109.

[28] *See In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *7 (Del. Ch. Jan. 5, 2017) (holding that, in the *Corwin* context, the plaintiff must plead facts that allow a reasonable inference that the stockholder vote was not informed).

[29] *See Singh v. Attenborough*, 137 A.3d 151, 151–52 (Del. 2016) ("When the business judgment rule standard of review is invoked because of a vote, dismissal is typically the result. That is because the vestigial waste exception has long had little real-world relevance, because it has been understood that stockholders would be unlikely to approve a transaction that is wasteful.") (citations omitted). *See also In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 750 (Del. Ch. 2016), *aff'd*, 2017 WL 563187 (Del. Feb. 9, 2017) (after finding that the tender offer was subject to the cleansing effect of *Corwin* and was therefore subject to the business judgment rule standard of review, the court held that the transaction could "therefore only can be challenged on the basis that it constituted waste").

that the alleged deficiency fails as a matter of law in order to secure the cleansing effect of that vote."[30] Delaware law requires directors to "disclose fully and fairly all material information within the board's control" when soliciting stockholder action.[31] This obligation of disclosure extends only to information that is material,[32] and information is material when "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[33] Stated differently, a disclosure is material only if it "significantly alter[s] the 'total mix' of information made available" to the stockholders.[34]

Plaintiff has alleged four areas where the Proxy omitted material facts: "(i) the reasons why Saba was unable to complete the restatement; (ii) Saba management's financial projections; (iii) Morgan Stanley's financial analyses supporting its fairness opinion and potential conflicts of interest; and (iv) the process

---

[30] *In re Solera Hldgs.*, 2017 WL 57839, at *7–8.

[31] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

[32] *In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 511 (Del. Ch. 2010) (holding that stockholders are not entitled to every fact and figure that a shareholder might theoretically want or might find helpful). *See also In re Merge Healthcare Inc. S'holders Litig.*, 2017 WL 395981, at *9 (Del. Ch. Jan. 30, 2017) ("'Fully informed' does not mean infinitely informed, however.").

[33] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985).

[34] *Arnold v. Soc'y for Sav. Bancorp*, 650 A.2d 1270, 1277 (Del. 1994).

leading up to the execution of the Merger Agreement."[35]  Two of the four categories of disclosure deficiencies identified by the Plaintiff, relating to the management projections and the work of Morgan Stanley, recast disclosure allegations that this court repeatedly has rejected under similar circumstances.  I address these first.  I then address Plaintiff's allegations in support of the other two material omissions identified in the Complaint relating to the failure to explain the circumstances surrounding the Company's failure to complete the Restatement and the events leading up to the Merger.  For reasons explained below, applying a reasonably conceivable standard to these allegations, I conclude that Plaintiff has identified material omissions from the Proxy that undermined the stockholder approval of the Merger.[36]

### (a)  The Omitted Management Projections

Plaintiff has alleged a litany of alleged omissions regarding the financial projections prepared by Saba's management which Morgan Stanley relied upon for its fairness opinion.  Specifically, Plaintiff finds fault with the Proxy's failure to disclose management's financial projections for "(i) revenue; (ii) EBITDA (2020–

---

[35] Compl. ¶ 110.

[36] I am mindful that Plaintiff could have (but did not) seek to enjoin the Merger which is a preferred means to address serious disclosure claims in connection with a proposed transaction.  *See In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 360 (Del. 2008).  Failing to pursue that remedy, however, does not deprive the Plaintiff of a right to press disclosure claims post-closing. *Id.*

2024); (iii) EBIT (or depreciation and amortization); (iv) restatement expenses (2020–2024); (v) taxes (2020–2024); (vi) capital expenditures (2020–2024); (vii) changes in net working capital (2020–2024); (viii) stock-based compensation expense (2020–2024); and (ix) unlevered free cash flow (2020–2024)."[37]

Management projections are clearly material to stockholders when deciding whether to vote for a merger.[38] Plaintiff has focused his criticisms on management projections for years 2020–2024. The Proxy disclosed the management projections for 2015–2019.[39] The only indication that projections existed for 2020–2024 is in Morgan Stanley's description of its discounted cash flow analysis ("DCF"), where the Proxy states that Morgan Stanley developed the numbers for 2020–2024 used in its DCF "by an extrapolation of the 2019 estimates in the management projections based on 2019 growth and margin performance in the Management Case to reach a steady state margin and growth profiled by 2024."[40]

---

[37] Compl. ¶ 113.

[38] *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *15 (Del. Ch. Aug. 18, 2006).

[39] Proxy at 40, 44.

[40] Proxy at 40.

"I reiterate this Court's consistent position that 'management cannot disclose projections that do not exist.'"[41] The Proxy's failure to disclose management projections for 2020–2024 cannot constitute a material omission because Plaintiff has failed to plead facts that would allow an inference that such projections even existed. And the omission from a proxy statement of projections prepared by a financial advisor for a sales process rarely will give rise to an actionable disclosure claim.[42]

Turning next to Plaintiff's claim that the Proxy should have disclosed management projections for revenue and EBIT (or depreciation and amortization), I note that the Proxy clearly disclosed revenue for fiscal years ending May 31, 2016, 2017 and 2018.[43] To the extent Plaintiff quibbles with the omission of projections for later years, once again, Plaintiff has failed to allege that these projections exist. With regard to the omission EBIT-related data, the Proxy discloses adjusted EBITDA for 2015–2019, which is what Morgan Stanley relied upon when

---

[41] *In re BioClinica, Inc. S'holder Litig.*, 2013 WL 673736, at *5 (Del. Ch. Feb. 25, 2013) (quoting *In re CNX Gas Corp. S'holders Litig.*, 4 A.3d 397, 419 (Del. Ch. 2010)).

[42] *See, e.g., In re Plains Exploration & Prod. Co. S'holder Litig.*, 2013 WL 1909124, at *8 (Del. Ch. May 9, 2013) (refusing to recognize as material the omission in the proxy of cash flow numbers derived by the investment banker from projections prepared by the company which were included in the proxy).

[43] Proxy at 44.

conducting its DCF.[44]  Plaintiff fails to explain why the disclosure of EBIT (or depreciation and amortization, from which a stockholder presumably could calculate EBIT from the disclosed EBITDA), would be anything more than merely "helpful."[45]

Plaintiff also contends that "even more importantly, the Proxy does not adequately disclose the justifications for the modifications to the Company's forecasts throughout the process and, in particular, following receipt of Vector's offer."[46]  This court typically is not receptive to these kinds of "why" or "tell me more" disclosure claims that criticize the board for failing to explain its motives when making transaction-related decisions.[47]  Yet this is precisely what the Plaintiff

---

[44] Proxy at 40.

[45] *In re Cogent*, 7 A.3d at 509–10.

[46] Compl. ¶ 114.

[47] *See In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1131 (Del. Ch. 2011) (holding that the omission of information as to why the board of directors negotiated to remove a condition from the tender offer did not state a valid disclosure claim).  *See also In re Solera Hldgs.*, 2017 WL 57839, at *12 (holding that the omission of the reasons behind a supposed shift in compensation strategy did not state a valid disclosure claim); *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *14 (Del. Ch. June 30, 2014) (holding that the omission of why a financial advisor applied certain multiples in its analysis did not state a valid disclosure claim).  *See also Se. Pa. Transp. Auth. v. Volgenau*, 2013 WL 4009193, at *20 (Del. Ch. Aug. 5, 2013) (refusing to recognize "tell me more" disclosure claims seeking additional minor details as material given extensive disclosure provided in the proxy), *aff'd*, 91 A.3d 562 (Del. 2014) (TABLE) ; *In re Plains Exploration*, 2013 WL 1909124, at *10 (same); *Freedman v. Adams*, 2012 WL 1345638, at *17 (Del. Ch. Mar. 30, 2012) (same), *aff'd*, 58 A.3d 414 (Del. 2013).

is seeking here: a further disclosure as to why management and the Board elected to make modifications to the Company's financial projections. The Proxy discloses the assumptions and data upon which management created the various scenarios that were set forth in the forecasts.[48] By comparing the changing assumptions that went into the various scenarios, a stockholder could readily track the changes and reasonably infer the rationale that went into the changes from one scenario to another. Plaintiff does not allege any facts or assumptions regarding the modifications that were omitted or misleading. He fails, therefore, to state a viable disclosure claim regarding the Saba management projections included in the Proxy.

### (b) The Omitted Information Regarding Morgan Stanley's Valuation Analysis and Conflicts

Plaintiff identifies two categories of omissions in the Proxy in connection with Morgan Stanley's work: (1) omissions regarding Morgan Stanley's valuation of Saba and (2) omissions regarding Morgan Stanley's conflicts of interest arising from its prior relationship with Vector. Neither reflect material omissions.

First, Plaintiff alleges that Morgan Stanley did not adequately disclose various facts, in four different categories, related to its valuation of Saba. For the first category—information pertaining to Morgan Stanley's Public Trading Comparables Analysis—Plaintiff alleges that the Proxy failed to disclose the "2014–2016

---

[48] Proxy at 43.

aggregate value/revenue and AV/EBITDA multiples for each of the selected public companies analyzed," the revenue growth rates, gross margin and EBIT margin and "why Morgan Stanley relied on the multiples from the Enterprise Software peers instead of the Human Capital Management peers."[49]  For Morgan Stanley's Precedent Transactions Analysis, Plaintiff claims that the Proxy failed to disclose the AV/last twelve months revenue, the AV/next twelve months revenue (and the one-day unaffected price premium multiples for each of the transactions analyzed) and "the specific subset of transactions that were analyzed with respect to the application of one-day unaffected premium paid analysis."[50] Plaintiff further alleges that the Proxy failed to disclose, with regard to Morgan Stanley's DCF analysis, "the implied terminal EBITDA multiple range and the implied terminal revenue multiple range," various "individual inputs and assumptions utilized by Morgan Stanley to derive the discount range of 7.1%–8.1%," "that Morgan Stanley incorporated Saba's net operating losses ('NOLs') in its analysis and assumed a present value of approximately $25 million, per management, from the total $274.1 million of NOLs available to the Company," "the inputs and assumptions utilized by management to determine the $25 million present value of Saba's NOLs," and "the specific

---

[49] Compl. ¶¶ 115(a)(i)–(iii).

[50] Compl. ¶¶ 115(b)(i)–(ii).

arithmetic errors with respect to the treatment of certain stock based compensation and restatement expenses within Morgan Stanley's analysis."[51]   Finally, Plaintiff alleges that the Proxy failed to disclose, with regard to Morgan Stanley's Discounted Equity Value Analysis, the "2018 estimated cash and estimated debt utilized by Morgan Stanley in its analysis" and "that Morgan Stanley utilized a revenue multiple range of 1.2x–2.4x as opposed to the range of 1.5x–2.5x referred to in the Proxy."[52]

When voting on a merger, "stockholders are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender offer rely."[53] "A fair summary, however, is a *summary*."[54] The relevant disclosure document must disclose "the valuation methods used to arrive at that opinion as well as the key inputs and the range of ultimate values generated by those analyses."[55]  "Whether a particular piece of an investment bank's analysis needs to be disclosed, however, depends on whether it is material, on the one hand, or immaterial minutia, on the

---

[51] Compl. ¶¶ 115(c)(i)–(v).

[52] Compl. ¶¶ 115(d)(i)–(ii).

[53] *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002).

[54] *In re Trulia S'holder Litig.*, 129 A.3d 884, 900 (Del. Ch. 2016) (emphasis in original).

[55] *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 203–04 (Del. Ch. 2007).

other."[56]  In this regard, the summary of the banker's work need only "be sufficient for the stockholders to usefully comprehend, not recreate, the analysis."[57]

Here, the Proxy, over the course of nine single-spaced pages, described Morgan Stanley's analyses, including the methodology and projections used, the lists of comparable companies and transactions considered, and the valuation range resulting from these analyses.[58]  Plaintiff has failed to well-plead any facts, or provide any explanation, as to why any of the minutia he says should have been in the Proxy would have significantly altered the "total mix" of information Saba shareholders received.[59]  The Proxy provided Saba stockholders with a fair summary of the Morgan Stanley valuation analysis including its key inputs, and the "additional

---

[56] *Id.*

[57] *In re Merge Healthcare*, 2017 WL 395981, at *10.

[58] Proxy at 36–44.

[59] The Complaint recites these many alleged material omissions at some length, but when the Individual Defendants challenged the materiality of these omissions in their motion to dismiss, Plaintiff's answering brief offers little resistance in a single sentence: "[t]he Proxy also omits material information regarding Morgan Stanley's financial analyses supporting its fairness opinion."  Pl. Gary Poltash's Answering Br. in Opp'n to the Individual Defs.' and the Vector Defs.' Mot. to Dismiss the Second Am. Verified Class Action Compl. ("Answering Br.") 54.

granularity" Plaintiff has pointed to would be nothing "more than helpful or cumulative to the information already disclosed."[60]

In addition to these classic "tell me more" disclosure claims, Plaintiff alleges that the Proxy did not adequately disclose the "specific services Morgan Stanley provided to [Vector], and/or any of its affiliates in the past two years and the amount of compensation received for such services rendered."[61] That the Board was obliged to disclose "potential conflicts of interest of [its] financial advisors" so that "stockholders [could] decide for themselves what weight to place on a conflict faced by the financial advisor" has not been, and cannot be, disputed.[62] Whether the Proxy fulfilled this obligation, however, is very much contested. On this point, the Individual Defendants have the better of the argument. The Proxy disclosed that, in the two previous years, "Morgan Stanley or its affiliates have provided financing services to a Vector Capital affiliate and received customary fees of approximate[ly] $1 million in connection with those services."[63] This disclosure addresses precisely

---

[60] *Dent*, 2014 WL 2931180, at *12. *See also id.* at *14 (explaining that the issue of whether the financial advisor's analysis was correct is distinct from whether all material facts relating to the analysis were disclosed).

[61] Compl. ¶ 117.

[62] *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *16 (Del. Ch. Oct. 2, 2009).

[63] Proxy at 42.

31

what Plaintiff claims is missing, except that it does not detail the specific services rendered. Here again, Plaintiff offers no explanation of how the specific services Morgan Stanley provided to Vector affiliates in the past would materially alter the total mix of information that Saba stockholders would find important when deciding how to vote. What was material, and disclosed, was the prior working relationship and the amount of fees.

### (c) The Omitted Information Regarding the Failure to Complete the Restatement

Plaintiff points to the failure to describe the circumstances surrounding the Company's failure to complete the Restatement by the deadline set by the SEC as "the most glaring information missing from the Proxy."[64] According to the Plaintiff, this information is material because the deregistration clearly depressed the amount potential buyers were willing to pay for Saba and stockholders needed to understand whether the Company's state of deregistration was likely to continue or whether the Company had a legitimate prospect of completing the Restatement and regaining registered status with the SEC. Plaintiff also contends that the explanation of why the Company missed the SEC's deadline was material to stockholders as they

---

[64] Compl. ¶ 111.

assessed "the reliability of the financial projections relied on by Morgan Stanley in rendering its fairness opinion."[65]

As already noted, this court repeatedly has held that "asking 'why' does not state a meritorious disclosure claim."[66] But in each of those cases, the "why" involved a decision made either by the board of directors, an officer or a company advisor. That is not what the Plaintiff alleges was omitted here. Rather, he alleges that the Board failed to disclose the factual circumstances regarding its failure, yet again, to complete the restatement of its financials. This was not a purposeful decision of the Board (at least it was not disclosed as such); it was a factual development that spurred the sales process and, if not likely correctible, would materially affect the standalone value of Saba going forward.

To be sure, the Proxy was by no means silent with respect to the Restatement. It disclosed details regarding the events that led up to Saba's need to restate its financials,[67] explained the consequences of the deregistration—that Saba stock would no longer be freely tradeable,[68] provided the best estimate of Saba's

---

[65] Answering Br. 50.

[66] *In re Sauer-Danfoss*, 65 A.3d at 1131; *In re Solera Hldgs.*, 2017 WL 57839, at *12; *Dent*, 2014 WL 2931180, at *14.

[67] Proxy at 78.

[68] Proxy at 23, 79.

management and Board of when the Restatement would be completed if Saba was not sold (August 2015),[69] and provided the projected value of Saba as a standalone company if the Restatement was completed in August 2015 or if it was not completed until December 2015.[70] Given its past history, however, unless the stockholders were armed with information that would allow them to assess the likelihood that Saba would ever complete a restatement of its financials, they would have no means to evaluate the choice they were being asked to make—accept merger consideration that reflected the depressed value caused by the Company's regulatory non-compliance or stay the course in hopes that the Company might return to the good graces of the SEC.[71]

Plaintiff has also earned a pleading-stage inference that the stockholders would need all material information regarding the likelihood that the Company could ever complete the Restatement in order meaningfully to assess the credibility of the

---

[69] Proxy at 43.

[70] Proxy at 43–44.

[71] *Cf. In re MONY Gp. Inc. S'holder Litig.*, 852 A.2d 9, 24–25 (Del. Ch. 2004) ("[O]nce a company travels down the road of partial disclosure of the history leading up to the Merger . . . [it has] an obligation to provide the stockholders with an accurate, full and fair characterization of those historic events.") (citations and internal quotations omitted). Specifically, Plaintiff argues that "[w]hile the Company had repeatedly promised Saba stockholders for nearly three years that the Company would file restated financial results, the Proxy was silent on why the investigation was never completed, despite the fact that the Company expended three years and more than $37 million on expenses related to the investigation." Answering Br. 49–50 (citations omitted).

management projections. The Company had repeatedly failed to meet deadlines to restate its financials. The management projections assumed the Company would complete the Restatement at some point in the future. Without the means to test that assumption by drilling down on the circumstances surrounding the Company's past and latest failure to deliver its restated financials, stockholders had no basis to conclude whether or not the projections made sense.[72]

### (d) The Omitted Information Regarding the Sales Process

Finally, Plaintiff alleges that the Proxy omitted material information regarding the sales process. The Proxy, over the course of nine single-spaced pages, detailed the "Background of the Merger," including the lengthy sales process and all contacts with parties that were potentially interested in acquiring Saba.[73] Nevertheless, Plaintiff alleges that the Proxy failed adequately to describe the events leading up to the Merger in several respects. While most of these criticisms fall well short of identifying material omissions or misstatements, Plaintiff has identified one omission within the Proxy's description of the events leading up to the Merger that a reasonable shareholder likely would have deemed important when deciding

---

[72] I acknowledge that directors are not obliged to engage in "self-flagellation" in their disclosures to stockholders. *Khanna v. McMinn*, 2006 WL 1388744, at *29, 34 (Del. Ch. May 9, 2006). That is not what the Plaintiff says is missing here. Rather, he alleges that the Proxy failed to disclose the facts surrounding the Company's failure to meet the SEC deadline, whether benign or otherwise.

[73] Proxy at 24–33.

whether to approve the Merger.[74]  Specifically, Plaintiff's allegations with respect to the omission of the post-deregistration options available to Saba, as discussed by the Ad Hoc Committee on December 3, 2014, make a compelling case for materiality. It is true, as the Individual Defendants trumpet, that Delaware law "does not require management 'to discuss the panoply of possible alternatives to the course of action it is proposing . . . .'"[75]  As then-Chancellor Chandler explained, this settled guidance with respect to disclosure is justified because "stockholders have a veto power over fundamental corporate changes (such as a merger) but entrust management with evaluating the alternatives and deciding which fundamental changes to propose."[76]

---

[74] Plaintiff's other criticisms, including the omission of information regarding financing options available to Saba in 2013, the terms of an expression of interest from "PE Firm D" in 2013, details relating to the formation of the Ad Hoc Committee, details relating to the financial models considered by the Ad Hoc Committee in 2014, details relating to Farshchi's discussions with other suitors regarding employment, all miss the mark.  After carefully reviewing the Proxy, I am satisfied either that the Proxy discloses what Plaintiff alleges is omitted (e.g. material information regarding the Ad Hoc Committee or Farshchi's motivations as a negotiator, as found in the Proxy at 26, 32, 48–50), or that the alleged omissions, if included in the Proxy, would have provided nothing more than immaterial "additional granularity." *See In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 114 (Del. Ch. 2007) (holding that "a reasonable stockholder would want to know an important economic motivation of the negotiator singularly employed by a board to obtain the best price for the stockholders, when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price, because the overall procession of a deal was more important to him, given his overall economic interest, than only doing a deal at the right price . . ."); *Dent*, 2014 WL 2931180, at *12 (proxy need not disclose unnecessarily "granular" information).

[75] *In re 3Com S'holders Litig.*, 2009 WL 5173804, at *6 (Del. Ch. Dec. 18, 2009) (quoting *Seibert v. Harper & Row, Publ'rs, Inc.*, 1984 WL 21874, at *5 (Del. Ch. Dec. 5, 1984)).

[76] *Id.*

36

While this holds true in a typical case, this is hardly a typical case given the deregistration of Saba's shares by the SEC just prior to the time the stockholder vote on the Merger was to occur.[77] This caused a fundamental change to the nature and value of the stockholder's equity stake in Saba over which the stockholders had no control. The deregistration also dramatically affected the environment in which the Board conducted the sales process and in which stockholders were asked to exercise their franchise. The Board needed to take extra care to account for this dynamic in its disclosures to stockholders.

In considering whether or not Saba was viable as a going-concern without the Merger, a reasonable stockholder would have needed to understand what alternatives to the Merger existed. Plaintiff alleges that Morgan Stanley advised the Ad Hoc Committee during its meeting on December 3, 2014, that the Thoma Bravo proposal was a "discount to current market prices" of Saba stock and, importantly, that a transaction with Thoma Bravo "would 'eliminate[] further upside for investors from standalone value creation.'"[78] Morgan Stanley cautioned that further pursuit of the

---

[77] *See In re Answers Corp. S'holder Litig.*, 2012 WL 3045678, at *2 (Del Ch. July 19, 2012) (in noting that the "case [was] not typical," the court observed: "Most cases do not involve a company's board speeding up the sales process to get a deal done" after the company's financial advisor told the board that "a failure to act quickly" might result in "the market learn[ing] the company is worth more than the deal price and the deal will be scuttled").

[78] Compl. ¶ 51.

Thoma Bravo deal "could trigger '[l]ikely shareholder litigation … due to price below market.'"[79]   It is reasonably conceivable that Plaintiff will be able to demonstrate a substantial likelihood that a reasonable Saba stockholders would have found this information to be important when deciding how to vote on the Merger. The failure to disclose it in the Proxy undermines the cleansing effect of the stockholder vote under *Corwin.*

## 2. Plaintiff Has Adequately Pled that the Stockholder Vote Was Coerced

In addition to requiring a fully informed stockholder vote as a predicate to cleansing, *Corwin* also directs that the court consider whether the Complaint supports a reasonable inference that the stockholder vote was coerced.[80]   It is settled in our law that a stockholder vote may be invalidated "by a showing that the structure or circumstances of the vote were impermissibly coercive."[81]   The court will find wrongful coercion where stockholders are induced to vote "in favor of the proposed transaction for some reason other than the economic merits of that transaction."[82]   It

[79] *Id.*

[80] *Corwin*, 125 A.3d at 312.

[81] *Williams v. Geier*, 671 A.2d 1368, 1382 (Del. 1996).

[82] *Williams*, 671 A.2d at 1382–83.  *See also Eisenberg v. Chi. Milwaukee Corp.*, 537 A.2d 1051, 1061 (Del. 1996) ("The standard applicable to the plaintiff's claim of inequitable coercion is whether the defendants have taken actions that operate inequitably to induce the [] shareholders to tender their shares for reasons unrelated to the economic merits of the offer."); *Gradient OC Master, Ltd. v. NBC Univ., Inc.*, 930 A.2d 104, 119 (Del. Ch. 2007) ("[A] shareholder is actionably coerced when he is forced into 'a choice between a

is not enough for an offer to be "economically 'too good to resist'" to constitute

wrongful coercion.[83]   Rather, in determining whether *vel non* stockholders were

inequitably coerced, the court must be mindful that

> for purposes of legal analysis, the term 'coercion' itself—covering a multitude of situations—is not very meaningful.  For the word to have much meaning for purposes of legal analysis, it is necessary in each case that a normative judgment be attached to the concept ('inappropriately coercive' or 'wrongfully coercive', etc.).  But, it is then readily seen that what is legally relevant is not the conclusory term 'coercion' itself but rather the norm that leads to the adverb modifying it.[84]

---

new position and a compromised position' for reasons other than those related to the economic merits of the decision.") (quoting *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 621 (Del. Ch. 1999)); *In re Siliconix Inc. S'holder Litig.*, 2001 WL 716787, at * 15 (Del. Ch. June 19, 2001) ("A tender offer is wrongfully coercive if the tendering shareholders are 'wrongfully induced by some act of the defendant to sell their shares for reasons unrelated to the economic merits of the sale.'") (quoting *Ivanhoe P'rs v. Newmont Mining Corp.*, 533 A.2d 585, 605 (Del. Ch.), *aff'd*, 535 A.2d 1334 (Del. 1987)).

[83] *Newmont*, 533 A.2d at 605 (quoting *Lieb v. Clark*, 1987 WL 11903, at *4 (Del. Ch. June 1, 1987)).

[84] *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986).  *See also Gradient*, 930 A.2d at 117 ("[T]he ordinary definition of 'coercion,' something akin to intentionally persuading someone to prefer one option over another, is not the same as saying that the persuasion would so impair the person's ability to choose as to be legally actionable.  The challenged conduct must be 'wrongfully' or 'actionably' coercive for a legal remedy to ensue.") (citations omitted); *Solomon*, 747 A.2d at 1131 ("All disclosure of material information may cause shareholders to vote in a particular way, and so is, in some general sense, 'coercive.'  Considering the legal imperative that all shareholders be armed with all material information, it cannot be that the mere potential to influence a shareholder's vote renders disclosed information actionable."); *Next Level Commc'ns v. Motorola, Inc.*, 834 A.2d 828, 853 (Del. Ch. 2003) ("Generally, reports of factual matters that are neutrally stated and not threatening do not amount to wrongful coercion.").

Whether a particular vote was inequitably coerced and therefore "robbed of its effectiveness . . . depends on the facts of the case."[85]

The determination of whether coercion was inequitable in a particular circumstance is a relationship-driven inquiry.[86] A corporation's directors are fiduciaries of their stockholders "whose interests they have a duty to safeguard."[87] Therefore, when addressing a potentially coercive interaction between a board of directors and the stockholders it serves, the relevant legal norms stem from the law of fiduciary duty. And, in this regard, whether the fiduciary's motives were benign or unfaithful when creating the circumstances that cause coercion is not dispositive of the determination of whether the coercion was inequitable.[88] The coercion

---

[85] *Williams*, 671 A.2d at 1383. *See also Brazen v. Bell Atl. Corp.*, 1997 WL 153810 at \*5 (Del. Ch. Mar. 19) ("Whether coercion is inequitable depends on the particular facts and circumstances of the case. What might be inequitably coercive in one situation, might be coercive, but not inappropriately so, in another.") (citations omitted), *aff'd on other grounds*, 695 A.2d 43 (Del. 1997).

[86] *Cf. Katz.*, 508 A.3d at 880 (looking to the law of contracts to determine whether inequitable coercion occurred where the relevant relationship was contractual—between a corporation and the holders of its debt securities).

[87] *Eisenberg*, 537 A.2d at 1062.

[88] *Lacos Land Co. v. Arden Gp., Inc.*, 517 A.2d 271, 278 (Del. Ch. 1986) (holding that motivation behind the challenged vote was not relevant to the determination that the vote was coerced because "[a]s a corporate fiduciary, [the CEO] has no right to take such a position, even if benevolently motivated in doing so"). *Cf. Chesapeake Corp. v. Shore*, 771 A.2d 293, 318 (Del. Ch. 2000) (discussing Chancellor Allen's decision in *Blasius* in determining whether the board's action impeding stockholder franchise was inequitable as one where the "real question was 'whether, in these circumstances, the board, even if it *is* acting with subjective good faith . . . may validly act for the principal purpose of preventing the shareholders from electing a majority of new directors. The question thus posed is not

inquiry, instead, focuses on whether the stockholders have been permitted to exercise their franchise free of undue external pressure created by the fiduciary that distracts them from the merits of the decision under consideration.[89]  In the deal context, the vote must be structured in such a way that allows shareholders a "free choice between maintaining their current status [or] taking advantage of the new status offered by" the proposed deal.[90]

Here, in voting on the Merger, Saba stockholders were given a choice between keeping their recently-deregistered, illiquid stock or accepting the Merger price of $9 per share, consideration that was depressed by the Company's nearly contemporaneous failure once again to complete the restatement of its financials.[91]

---

one of intentional wrong (or even negligence), but one of authority *as between the fiduciary and the beneficiary . . .* "") (quoting *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 658 (Del. Ch. 1988)).

[89] *Williams*, 671 A.2d at 1382–83. *See also Gradient*, 930 A.2d at 117–121 (collecting coercion cases).

[90] *Gen. Motors*, 734 A.2d at 621.  *See also AC Acqs. Corp. v. Anderson, Clayton & Co.*, 519 A.2d 103, 113 (Del. Ch. 1986) (inequitable coercion occurs when the board creates circumstances that surround the stockholder vote where "no rational shareholder could afford not to [vote in favor of the board proposal] . . . at least if that transaction is viewed in isolation.").

[91] The Proxy advised stockholders that because the Company had failed to complete the Restatement by the time agreed to in its settlement with the SEC, and because the SEC had deregistered the stock as a consequence, "until [Saba] has regained compliance and filed a registration statement . . . and such registration statement has become effective, shares of [Saba] stock [could not] be traded on the OTC or any other market and broker dealers [were] prevented from effecting transactions involving [Saba] securities using means of interstate commerce." Proxy at 2, 13, 23. *See also* Proxy at 78 ("As a result of the deregistration of our common stock, there is no longer any active trading market for shares

This Hobson's choice was hoisted upon the stockholders because the Board was hell-bent on selling Saba in the midst of its regulatory chaos. Yet the Board elected to send stockholders a Proxy that said nothing about the circumstances that were preventing the Company from filing its restatements and therefore offered no basis for stockholders to assess whether the choice of rejecting the Merger and staying the course made any sense.[92] The forced timing of the Merger and the Proxy's failure to disclose why the Restatement had not been completed and what financing alternatives might be available to Saba if it remained a standalone company left the Saba stockholders staring into a black box as they attempted to ascertain Saba's future prospects as a standalone company. This left them with no practical alternative but to vote in favor of the Merger.

The Individual Defendants argue that to find "actionable coercion" the court must identify "some *affirmative action* by the fiduciary in connection with the vote [] that reflect[s] some structural or other mechanism for or promise of retribution

---

of our common stock."). The Proxy then reiterated, repeatedly, that "any resulting 'market' for shares of our common stock would be extremely limited and illiquid until such time as we complete the restatement and regain eligibility for trading on the OTC or another active securities market." Proxy at 2, 13, 23. *See Eisenberg*, 537 A.2d at 1062 (stating the obvious: an ability to trade represents a large component of a stock's market value).

[92] While the Proxy disclosed that the Company anticipated it could complete the Restatement by August 2015, Saba had known about the need to restate its financials since at least June 2012, and yet over two years later it still had not delivered on its repeated assurances that it would get the job done. *See* Proxy at 24, 43.

that would place the stockholders who reject the proposal in a *worse* position than they occupied before the vote."[93]  While I disagree that the Complaint has failed to allege wrongful affirmative action by the Board, I also disagree that affirmative action is a predicate to wrongful coercion.  Inequitable coercion can exist as well when the fiduciary fails to act when he knows he has a duty to act and thereby coerces stockholder action.[94]

Plaintiff's case for inequitable coercion, as alleged in the Complaint, tells a compelling story of Board action and inaction in the face of a duty to act.  Saba engaged in financial fraud with its Indian subsidiary.  To account for this fraud, the Company was required to restate its financials.  When it inexplicably and repeatedly failed to do so, its stock was delisted from NASDAQ.  Saba then settled an enforcement action with the SEC and promised to complete the Restatement by a date certain.  When it failed to act, again inexplicably, the SEC deregistered its stock.  The subsequent events unfolded like a tragic requiem.  The stock price fell; the Board

---

[93] Letter to The Honorable Joseph R. Slights, III dated February 17, 2017 from Gregory V. Varallo in response to the Court's January 31, 2017 request for supplemental letter memoranda ("Individual Defs.' Supplemental Letter Br.") 5, citing, *inter alia*, *Gradient*, 930 A.2d at 117; *Gen. Motors*, 734 A.2d at 621.

[94] *Cf. In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006) (holding that a director acts in bad faith when he "intentionally fails to act in the face of a known duty to act"); *NHB Advisors, Inc. v. Monroe Capital LLC*, 2013 WL 3790745, at *2 (Del. Ch. July 19, 2013) ("If a fiduciary has a duty to act, and fails to act, the failure to act is a breach of duty.").

rushed the sales process while the Company was in turmoil and then lost all negotiating leverage; the Proxy left stockholders in the dark regarding the circumstances surrounding the Company's incomprehensible failure to file its Restatement and whether it could ever prepare proper financial statements, leaving them unable meaningfully to assess the value of Saba on a standalone basis; the deregistration allowed the Company to avoid SEC review of the Proxy and to rush the stockholder vote; and then, in this environment, the Board forced stockholders to choose between a no-premium sale or holding potentially worthless stock.[95] Under these circumstances, I am satisfied that the Plaintiff has well-pled that, at the time of the stockholder vote, "situationally coercive factors"[96] may have wrongfully induced the Saba stockholders to vote in favor of the Merger for reasons other than the economic merits of the transaction.

I acknowledge, as the Individual Defendants note,[97] that the Proxy stated the facts neutrally and in a non-threatening manner and that this is often a telltale

---

[95] The Individual Defendants argue that the deregistration of Saba stock "was a matter of history, not a threat for the future." Individual Defs.' Supplemental Letter Br. 6. That is not how Plaintiff has pled his breach of fiduciary duty claim. Rather, he has alleged that the stockholder vote was tainted by the uncertainty created by the Company's ongoing failure to complete restatements of its financials and the stockholders' inability meaningfully to assess whether the Company would ever return to a state of compliance. Compl. ¶¶ 13, 33, 110, 111–19.

[96] *Brazen*, 695 A.2d at 50.

[97] Individual Defs.' Supplemental Letter Br. 7.

indicator of a non-coercive proxy statement.[98]  In this case, however, it was not the

Proxy's words or even its tone that created the coercion; the inequitable coercion

flowed from the situation in which the Board placed its stockholders as a

consequence of its allegedly wrongful action and inaction.  Stated succinctly, the

Board created a "circumstance[] [that was] impermissibly coercive."[99]

---

[98] *Williams*, 671 A.2d at 1383 (finding that a proxy was not inequitably coercive when it "merely stat[ed] facts which were required to be disclosed" and where the required disclosures were "neutrally stated and not threatening in any respect").

[99] *Id.* at 1382.  The Individual Defendants seize on the language in *General Motors* where the court observed that, in cases that have found actionable coercion, "the electorate was told that retribution would follow if the proposed transaction was defeated."  *Gen. Motors*, 734 A.2d at 621.  While it is true that the Board stopped short of threatening retribution, the implicit threat was no less compelling.  The stockholders cast their votes in favor of the Merger under the threat that their only alternative was to hold onto deregistered stock with the knowledge that the Company may continue indefinitely to ignore its obligation to restate its financial statements and thereby foreclose any possibility that the stock might ever be registered and freely tradable again.  I note that *General Motors* is distinguishable in other ways as well.  Unlike the stockholders in *General Motors*, the Saba stockholders were not afforded the "free choice" to select between the Merger and a settled status quo.  The Saba Board had already impaired the status quo by causing the stock to be deregistered just prior to the vote, rushing the sales process and then failing to provide stockholders with adequate information to evaluate the new, impaired status quo.  According to the Individual Defendants, as of the date of the vote, "Saba's stockholders had two options: (1) merge with Vector (the 'new status'); or (2) hold Saba's stock and let the Company pursue efforts to re-register (which was 'precisely the same position they were in before the vote.')."  Individual Defs.' Supplemental Letter Br. 9 (quoting *Gen. Motors*, 734 A.2d at 620).  This characterization minimizes if not ignores the fact that the Board had already put the stockholders into a "compromised position" by failing to complete the Restatement and thereby causing the stock to be deregistered.  Against this backdrop, the Saba stockholders were forced to choose between the "new position" of relinquishing their shares in exchange for $9 in consideration, or the "compromised position" of holding onto illiquid shares for the foreseeable and perhaps indefinite future. As Plaintiff observes, "[a] 'no' vote would have left Saba stockholders with illiquid stock and, on the heels of three years of unexplained delays in completing the restatement, with no clue as to if and/or when the Company's financials would be brought current and the de-registration reversed."

### 3. *Revlon* Enhanced Scrutiny Will Apply

Plaintiff urges the Court to review the transaction under *Revlon* enhanced scrutiny.[100] Since *Corwin* does not apply, I agree that the Merger is subject to enhanced scrutiny and that the Individual Defendants will bear the initial burden of demonstrating that they were fully informed and acted reasonably in the sales process to secure the best available price.[101] Having now fully addressed the gating issue of standard of review, I turn next to the contention that Plaintiff cannot state a breach of fiduciary duty claim against the Individual Defendants.

### B. The Complaint States a Direct, Non-Exclupated Claim for Breach of Fiduciary Duty Against the Individual Defendants

Plaintiff alleges that the Individual Defendants breached their fiduciary duties of care and loyalty in connection with the Merger by "fail[ing] to negotiate a full and

---

Letter to Vice Chancellor Slights from Peter B. Andrews, Esq. in response to January 31, 2017 Letter requesting supplemental briefing 5. To make matters worse, the "compromised position" was one that stockholders could not fully comprehend given the failure of the Proxy to disclose why the Restatement had not been completed and what other post-deregistration options might be available to Saba as discussed by the Board on December 3, 2014. And, of course, because the stock was deregistered, the Board was able to hurry the vote since SEC review of the Proxy materials and GAAP financials was no longer required. If Plaintiff can prove that this, in fact, was the choice Saba stockholders were given, then they will prove that the stockholders were given no real choice at all.

[100] Answering Br. 34 (citing *Paramount Commc'ns. Inc. v. QVC Network Inc.*, 637 A.2d 34, 42 (Del. 1994); *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1000 (Del. Ch. 2005)).

[101] *Id.*

fair price for Saba's public shares following a process riddled with missteps and conflicts of interest."[102]  The Individual Defendants dispute these claims on the merits but also raise two predicate defenses that they argue require the Court to dismiss the claims as a matter of law.  *First*, the Individual Defendants characterize the gravamen of Plaintiff's Complaint as alleging that the Board mismanaged Saba during its Restatement process in a manner that caused the stock price to fall.  This claim, according to the Individual Defendants, is a derivative claim that was extinguished in the Merger.  *Second*, the Individual Defendants contend that even if the claims are direct claims, the Complaint fails to state any non-exculpated claims that can pass through the Section 102(b)(7) exculpatory clause in Saba's certificate of incorporation.[103]  I will address each argument in turn.

### 1.  Plaintiff has Pled Direct Claims

The Individual Defendants argue that at the core of Plaintiff's breach of fiduciary duty claim is the allegation that the Board failed adequately to oversee or otherwise manage the Company's effort to restate its financials, especially in connection with the SEC-mandated Restatement.  According to the Individual Defendants, this is a classic derivative claim that the Plaintiff no longer has standing

---

[102] *Id.* at 7.

[103] 8 *Del. C.* § 102(b)(7).

to pursue in the wake of the Merger. "Under Delaware law, it is well established that a merger which eliminates a derivative plaintiff's ownership of shares of the corporation for whose benefit she has sued terminates her standing to pursue those derivative claims."[104]

In determining whether a claim is derivative or direct, the court will consider "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)."[105] Claims of corporate mismanagement are classically derivative claims because, if proven, they represent "direct wrong to the corporation that is indirectly experienced by all shareholders."[106] While claims that challenge directors' conduct during a merger

---

[104] *Lewis v. Ward*, 852 A.2d 896, 900–01 (Del. 2004).

[105] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

[106] *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1998) ("[W]here a plaintiff shareholder claims that the value of his stock will deteriorate and that the value of his proportionate share of the stock will be decreased as a result of alleged director mismanagement, his cause of action is derivative in nature."). *See also Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *13 (Del. Ch. Aug. 26, 2005) ("The gravamen of these claims is that the Managers devoted inadequate time and effort to the management of the Funds, thereby causing their large losses. Essentially this [is] a claim for mismanagement, a paradigmatic derivative claim."); *Agostino v. Hicks*, 845 A.2d 1110, 1123 (Del. Ch. 2004) (holding a claim that a company impeded the pursuit of a value-maximizing transaction was a claim of mismanagement and therefore derivative); *In re Syncor Int'l Corp. S'holders Litig.*, 857 A.2d 994, 997–98 (Del. Ch. 2004) (same).

process are direct claims,[107] claims that corporate fiduciaries mismanaged the enterprise in a manner that lowered the price an acquiror is willing to pay in connection with a merger are derivative claims belonging to the corporation.[108]

Here, Plaintiff's claim against the Individual Defendants for breach of fiduciary duty arises from their conduct during the sales process and in recommending the Merger to stockholders. Specifically, Plaintiff alleges that

> the Individual Defendants initiated a process to sell Saba that undervalued the Company and vested them with benefits that were not shared equally by Saba's public stockholders. In addition, by agreeing to the Merger, the Individual Defendants capped the price of Saba stock at a price that does not adequately reflect the Company's true value. Moreover, the Individual Defendants disregarded the true value of the Company, in an effort to benefit themselves. The Individual Defendants made materially inadequate disclosures and material disclosure omissions in the Proxy disseminated to Company stockholders and completed the Merger pursuant to an uninformed vote of Saba's stockholders.[109]

As reflected in this summary of the Plaintiff's allegations, and as reiterated in Plaintiff's response to the motions to dismiss, the essence of the breach of fiduciary claim is "that the sales process was flawed, controlled by a conflicted insider, and that the price Saba stockholders received in the Merger was unfair."[110] While

---

[107] *See, e.g. Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1245 (Del. 1999).

[108] *Feldman v. Cutaia*, 951 A.2d 727, 734–35 (Del. 2008).

[109] Compl. ¶ 125.

[110] Answering Br. 23.

*Caremark* or *Kramer*-like claims might reside somewhere within the pled facts, Plaintiff has not made those claims and acknowledges that he would face a nearly vertical climb to establish his standing to do so now that the Merger has closed.[111] Instead, Plaintiff has endeavored to state a direct claim for breach of fiduciary duty relating to the Board's conduct of an allegedly flawed sales process, its role in approving a transaction that delivered unique benefits to management and members of the Board to the detriment of the stockholders and its failure to make complete disclosures in the Proxy. These are direct claims that "constitute a direct challenge to the fairness of the merger itself"; "[t]hey are not extinguished by the merger."[112]

Plaintiff undeniably has recited facts that spell out the Company's tortured history, including the financial fraud and repeated failures to restate its financial statements notwithstanding assurances to the market, regulators and stockholders that it would complete the task. Plaintiff has also related these facts to adverse consequences to the Company and its stockholders. These facts provide the

---

[111] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996) (addressing the derivative claim of breach of the directors' duty of corporate oversight); *Kramer*, 546 A.2d at 353 (addressing the derivative claim of mismanagement that causes an acquiror to offer less in an acquisition). *See* Tr. of Oral Arg. on Mots. to Dismiss Dec. 8, 2016 at 64.

[112] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 973 (Del. Ch. 2000). *See Chen v. Howard-Anderson*, 87 A.3d 648, 672–73 (Del. Ch. 2014) (holding that "enhanced scrutiny requires that the defendant fiduciaries show that they acted reasonably to seek the transaction offering the best value reasonably available to the stockholders, which could be remaining independent and not engaging in any transaction at all") (citations and internal quotation marks omitted).

background that animates the Plaintiff's theory that the Board timed the Merger to advance selfish objectives, including the desire to avoid further regulatory scrutiny and the push to monetize otherwise illiquid equity awards that had been suspended or canceled due to the failure to complete the Restatement. The fact that Plaintiff highlights mismanagement to enrich his breach of fiduciary duty narrative does not convert the claim from direct to derivative. He has standing to pursue Merger-related claims directly against the Individual Defendants and their effort to dismiss the claims on that basis is rejected.[113]

### 2. Plaintiff has Pled Non-Exculpated Claims

Saba's certificate of incorporation, of which I take judicial notice,[114] contains an exculpatory provision in Article IX which provides:

> The personal liability of the directors of the corporation is hereby eliminated to the fullest extent permitted by the provision of paragraph

---

[113] In the briefing, the parties addressed whether claims of mismanagement might survive the Merger under the so-called "fraud exception" to the continuous ownership requirement for derivative suits as recognized in *Ark. Teacher Ret. Sys. v. Countrywide Fin. Corp.*, 75 A.3d 888 (Del. 2013) ("*Countrywide II*"). Under *Countrywide II*, a former stockholder will not lose standing to pursue a derivative claim if she can establish that the merger "was the final step of a conspiracy to accomplish an unlawful end by unlawful means." *Id.* at 896. Plaintiff has not pled any such conspiracy here. While the Complaint alleges that the "Merger allowed Defendants to sweep their wrongdoing under the rug," Compl. ¶ 88, it nowhere alleges that the purpose of the Merger was to extinguish stockholders' derivative standing to challenge the mismanagement as required by *Countrywide II*.

[114] *See McMillan v. Intercargo Corp.*, 768 A.2d 492, 501 n.40 (Del. Ch. 2000).

(7) subsection (b) of Section 102 of the General Corporation Law of the State of Delaware, as the same may be amended and supplemented.[115]

"[A] plaintiff[] must plead a non-exculpated claim for breach of fiduciary duty against an independent director protected by an exculpatory charter provision, or that director will be entitled to dismissal from the suit."[116] Regardless of the standard of review that applies to the transaction, the charter's exculpatory provision insulates the Individual Defendants from claims they violated their duty of care in their capacity as directors.[117] It does not, however, insulate the Individual Defendants from alleged acts of bad faith or other breaches of the duty of loyalty.[118] In this regard, the Plaintiff must well-plead the loyalty breach or other non-exculpated claim against each individual director; group pleading will not suffice in the face of an exculpatory provision.[119]

---

[115] Burns Aff. Ex. 2 (Saba Software, Inc. Amended and Restated Certificate of Incorporation, dated April 12, 2000 (and subsequent amendments thereto)), Art. IX.

[116] *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1179 (Del. 2015).

[117] *Malpiede v. Townson*, 780 A.2d 1075, 1093–94 (Del. 2001). The exculpatory provision does not apply to Farshchi to the extent he was acting in his capacity as an officer. *See Gantler v. Stephens*, 965 A.2d 695, 709 n.37 (Del. 2009).

[118] *See Emerald P'rs v. Berlin*, 787 A.2d 85, 90 (Del. 2001) ("The purpose of Section 102(b)(7) was to permit shareholders . . . to adopt a provision in the certificate of incorporation to exculpate directors from any personal liability for the payment of monetary damages for breaches of their duty of care, but not for duty of loyalty violations, good faith violations, and certain other conduct.").

[119] *In re Cornerstone Therapeutics*, 115 A.3d at 1179.

Plaintiff argues that he has pled both director bad faith and breaches of the duty of loyalty. I address his arguments in that order.

### (a) Plaintiff has Alleged Actionable Bad Faith

Plaintiff alleges in various ways that the process by which the Board sold Saba was defective, in that the Board (1) abdicated oversight and control of the process to Farshchi and Morgan Stanley, (2) relied on a financial advisor with material conflicts, and (3) failed properly to ascertain Saba's value and growth prospects or fully consider alternatives to a sale. Under *Revlon v. MacAndrews & Forbes Holdings, Inc.*,[120] directors must engage in a sales process designed to maximize the price for its stockholders when there is a change of control.[121] The process need only be a reasonable process, however, not a perfect process, and there is no particular path the board must take to discharge its mandate.[122]

In light of the exculpatory provision, to state an actionable *Revlon* claim, Plaintiff must plead that the Individual Defendants consciously disregarded their duties, "knowingly and completely failed to undertake their responsibilities," and "utterly failed to attempt to obtain the best sale price."[123] Plaintiff's argument with

---

[120] 506 A.2d 173 (Del. 1986).

[121] *Id.* at 182.

[122] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 242 (Del. 2009).

[123] *Id.* at 243–44. *See also In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *7 (Del. Ch. May 20, 2016) (holding that "to state a bad-faith claim, a plaintiff

respect to bad faith is that the Complaint's "allegations are sufficient to infer that the Board breached their fiduciary duties in accepting a Merger value which, under any reasonable analysis and by Defendants' own admission, was at best a small fraction of what Saba was truly worth."[124] The bad faith, according to Plaintiff, is revealed by the fact that the Board rushed to complete the transaction prior to the February 15, 2015 deadline for the Restatement set by the SEC, *inter alia*, to enable the Board and members of management to cash-in on their equity awards knowing that the deregistration would otherwise render the awards practically worthless.

Vice Chancellor Glasscock aptly described a finding of bad faith as "a *rara avis*" (rare bird) in the fiduciary duty context.[125] In cases where "there is no indication of conflicted interests or lack of independence on the part of the directors," a finding of bad faith should be reserved for situations where "the nature of [the director's] action can in no way be understood as in the corporate interest."[126] With this in mind, the question of whether the Complaint pleads *prima facie* bad

---

must show either an extreme set of facts to establish that disinterested directors were intentionally disregarding their duties, or that the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith") (citations and internal quotation marks omitted).

[124] Answering Br. 46.

[125] *In re Chelsea Therapeutics*, 2016 WL 3044721, at *1.

[126] *Id.* I address Plaintiff's allegation that the Board acted with "conflicted interests" below.

54

faith is a close call. The Complaint acknowledges that the Board began meeting with Morgan Stanley in 2012 regarding possible strategic alternatives and formed a Strategic Committee of three independent directors in August 2013 to focus specifically on strategic alternatives. Saba then engaged in sale discussions with at least twelve parties from January to November 2014, and formed the Ad Hoc Committee of independent directors in November 2014 to provide additional oversight of the sales process. In December 2014, at the request of the Ad Hoc Committee and the Board, management developed projections for the Company to ascertain the impact of the likely deregistration on the Company. The Board considered those projections and from them determined the scenario it deemed most reasonable for Morgan Stanley to use in evaluating bids for the Company. The Board continued to evaluate the Company's options throughout January, when it received several new indications of interest, including Vector's. When Vector's proposal was the highest, the Board tried but failed to negotiate a price increase from Vector. Then, after receiving a fairness opinion from Morgan Stanley, the Board approved the Merger with Vector. At first glance, it is difficult to discern bad faith from this narrative.

But there was an elephant in the boardroom from 2012 forward. The Company had engaged in fraud. It needed to restate its financial statements to account for that fraud. When it repeatedly failed to do so, the exchange on which its

stock was listed, the SEC and the market reacted—in each instance badly for the Company. The SEC said "enough is enough" in September 2014 and set a deadline by which the Restatement had to be filed in order for the Company to avoid deregistration. This looming consequence became a foregone conclusion on December 15, 2014, when the Company announced that it would not complete the Restatement on time. Why the Company yet again could not complete the restatement of its financials remains a mystery. But the impact of this failure, according to the Complaint, is readily apparent. It is alleged that the members of the Board, collectively, rushed the sales process, refused to consider alternatives to a sale, cashed-in significant, otherwise worthless equity awards before the Merger, directed Morgan Stanley to rely upon the most pessimistic projections when considering the fairness of the transaction and then rushed the stockholder vote after supplying inadequate disclosures regarding the circumstances surrounding the failure to complete the Restatement.[127] Whether Plaintiff can develop proof to

---

[127] *In re PLX Tech. Inc. S'holders Litig.*, C.A. No. 9880-VCL, at *9–10 (Del. Ch. Sept. 3, 2015) (TRANSCRIPT) (holding that plaintiff's bad faith allegations survive a motion a dismiss, even though bad faith was not the only possible inference, where the plaintiffs alleged that the board "did not decide to sell and did not engage in the sale process entirely because it was in the best interests of the stockholders but rather did so, in part, [for reasons contrary to those interests]"); *In re Answers*, 2012 WL 1253072, at *4 (holding that plaintiffs stated a claim for bad faith that would overcome a 102(b)(7) exculpatory clause by pleading facts that the board consciously violated its duties under *Revlon* by rushing a sales process to closing before the stockholders "could appreciate the Company's favorable prospects"); *Parnes*, 722 A.2d at 1246 n.12 (holding that the court need not reach the issue

sustain these allegations remains to be seen, but for now, the Complaint alleges facts

from which it is reasonably conceivable that the Board's conduct with regard to the

sales process and approval of the Merger "can in no way be understood as in the

corporate interest."[128]  Stated differently, Plaintiff has pled adequate facts to justify

a pleading-stage inference of bad faith.[129]

of individual director independence "as our holding is based upon the entire board's apparent failure to exercise its business judgment in good faith").

[128] *In re Chelsea Therapeutics*, 2016 WL 3044721, at *1.

[129] Plaintiff has also argued that the Individual Defendants breached their fiduciary duties by ceding control of the negotiations to Farshchi and Morgan Stanley, by engaging a banker with conflicts and by engaging in a structurally flawed sales process.  These allegations do not pass through the exculpatory provision as they state, at best, duty of care violations. *See In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *7 (Del. Ch. Sept. 30, 2009) ("It is well within the business judgment of the Board to determine how merger negotiations will be conducted, and to delegate the task of negotiating to the Chairman and Chief Executive Officer."); *Lyondell*, 970 A.2d at 243 ("[T]here are no legally prescribed steps that directors must follow to satisfy their *Revlon* duties"); *In re Smurfit-Stone Container Corp. S'holder Litig.*, 2011 WL 2028076, at *23 (Del. Ch. May 20, 2011, *revised* May 24, 2011) (holding that contingent fees charged by investment bankers do not create inherent conflicts).  Of these allegations, the closest to state a non-exculpated claim is the allegation that the Board consciously disregarded its fiduciary duty by engaging Morgan Stanley knowing that it had previously done work for Vector.  Specifically, the Complaint alleges (and the Proxy disclosed) that after receiving Vector's indication of interest in January 2015, years after Morgan Stanley's engagement with Saba began, the Board was apprised of Morgan Stanley's prior relationship with Vector, where it and its affiliates had provided financing services to a Vector affiliate in exchange for customary fees of approximately $1 million.  There is no *per se* rule that after learning of this past relationship, the Board was obliged to terminate Morgan Stanley and engage a new advisor.  And the Complaint does not support a reasonable inference that Morgan Stanley's past relationship with Vector was of such significance that it could not fairly and impartially advise the Board.

**(b) Plaintiff has Alleged an Actionable Breach of the Duty of Loyalty**

To plead a claim for breach of the duty of loyalty that will overcome a motion to dismiss, a plaintiff must plead sufficient facts to support a rational inference that the corporate fiduciary acted out of material self-interest that diverged from the interests of the shareholders.[130] Plaintiff has alleged that the Individual Defendants breached their duty of loyalty by (1) securing for themselves material personal benefits in connection with the Merger and (2) consciously allowing Farshchi to negotiate for his own interests during the sale process at the expense of the stockholders.

**(i)  The Material Personal Benefits Conferred to the Board**

Plaintiff asserts that each member of the Board breached its fiduciary duty of loyalty by endorsing a less than value-maximizing transaction so that they could achieve material personal benefits in the form of cash for their otherwise illiquid equity awards.  As pled in the Complaint, Saba had been unable to award equity compensation to its directors for an extended time due to its need to restate its financials.  Then, on the day before the Merger Agreement was signed, the Board awarded cash payments equal to the amount of their suspended equity awards, including those that had either not been settled, had expired, lapsed or even been

---

[130] *Cede & Co v. Technicolor, Inc.*, 634 A.2d 345, 363–64 (Del. 1993).

58

canceled during the Restatement process. Awards that had not yet vested were accelerated.

The timing of the equity awards bolsters Plaintiff's self-interest theory. The Board approved an equity award to all independent directors on January 7, 2015, in the midst of Saba's sales process, upon the "recommendation of the Compensation Committee regarding the annual grant of 10,000 Restricted Stock Units to each independent Director serving on the Board."[131] The change of control payments, which converted equity awards into the right to cash payments upon a change of control, were then approved the day before the Merger Agreement was signed. In the ordinary course, as the Individual Defendants point out,[132] this timing would hardly support an inference of self-interest. Indeed, it is not at all uncommon for companies to address outstanding executive compensation on the eve of a merger.[133] But, again, this is not the typical case. The looming deregistration neutralized the equity awards; the prospect of a merger with Vector was the only means to revive

---

[131] Compl. ¶ 93.

[132] *See* Opening Br. in Supp. of the Individual Defs.' Mot. to Dismiss the Second Am. Verified Class Action Compl. ("Individual Defs.' Opening Br.") 30 (arguing that neither "[t]he substitution of cash compensation for pre-existing, vested compensation obligations" nor "[t]he acceleration of equity compensation is . . . a breach of fiduciary duty.").

[133] *See, e.g., In re OPENLANE, Inc. S'holders Litig.*, 2011 WL 4599662, at *5 (Del. Ch. Sept. 30, 2011); *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *8 (Del. Ch. Nov. 30, 2007); *Krim v. ProNet, Inc.*, 744 A.2d 523, 528 (Del. Ch. 1999).

them and convert them to cash. It is reasonably conceivable that this would steer the Individual Directors away from the standalone option, even if that option was in the best interests of stockholders.[134]

The Individual Defendants argue that "[a]t the Merger, Saba was contractually obligated to make good on its prior compensation commitments."[135] That may well be true but there is no reference to this alleged contractual obligation anywhere in the Complaint or in the documents incorporated therein by reference. Instead, the Complaint states that equity awards were likely illiquid due to the Company's ongoing failure to restate its financials and that there was no firm prospect that the awards would ever be made. While the timing of the equity compensation grants may not be quite as suspicious as those awarded in *K-Sea*, the fact that the Board received this cash compensation in lieu of suspended equity grants in connection with the Merger, given the uncertainty surrounding the Restatement, supports a reasonable inference that the Board approved the Merger in order to receive that

---

[134] *See Globis*, 2007 WL 4292024, at *9 (noting that "the acceleration of unvested options could be viewed as an inducement to effectuate" a merger, but determining the acceleration of options in that case was not significant enough to infer that the directors were interested in the transaction); *In re K-Sea Trans. P'rs L.P. Unitholders Litig.*, 2011 WL 2410395, at *7 (Del. Ch. June 10, 2011) (noting that significant options granted to members of the committee tasked with evaluating a transaction close in time to the commencement of negotiations supported an inference that the members were interested in the transaction).

[135] Individual Defs.' Opening Br. 30.

compensation.[136]  Therefore, I find that the Complaint adequately states a claim that the Board was interested in and approved the transaction due to the material personal benefits the directors would receive through cash compensation in lieu of equity grants in connection with the Merger.

### (ii) Farshchi's Employment and Compensation

Plaintiff also contends that Farshchi was motivated by self-interest in pursuing and negotiating the transaction with Vector, and that he dominated the Board throughout the sales process.[137]  Specifically, Plaintiff contends that Farshchi was

---

[136] This argument applies with equal force to Farshchi, who received even greater merger-related cash compensation for his equity.  As noted earlier, the section 102(b)(7) provision does not serve to exculpate Farshchi to the extent he was acting in his capacity as an officer.  While not contested by the Individual Defendants, I find that the benefits received by each of the Individual Defendants were material in that "the alleged benefit was significant enough '*in the context of the director's economic* circumstances, as to have made it improbable that the director could perform her fiduciary duties to the . . . shareholders without being influenced by her overriding personal interest.'" *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002) (quoting *Gen. Motors*, 734 A.2d at 617 (emphasis added) (citations omitted)).  Denzel, Fawkes, Klein, MacGowan, Russell, and Wilson each received $270,000 in merger-related compensation through the immediate vesting of their equity awards while Farshchi received $2,828,050.  These pled facts support a reasonable inference of materiality since the synthetic options and synthetic RSUs for which the Individual Defendants received cash compensation in connection with the Merger constituted the only holdings that they had in the Company.  *Compare Globis*, 2007 WL 4292024, at *9 (noting the importance of the fact that only a minimal portion of the directors' overall holdings were accelerated due to the merger in the court's determination that the directors were not conflicted in evaluating the merger) *with K-Sea*, 2011 WL 2410395, at *7 (finding that the complaint stated a colorable claim that an independent committee was tainted in evaluating a merger by recent equity grants representing a significant portion of those directors' holdings in the company).

[137] *See Orman*, 794 A.2d at 19–20.

driven to negotiate a deal with Vector, and then to push the Board to approve the transaction, so that he could secure employment with new-Saba after the Merger. Farshchi was an at-will employee at Vector after the Merger with the same base salary he had received prior to the Merger and a guarantee that the salary would never be reduced.[138]

The first meeting Farshchi had with Vector to negotiate his continued employment occurred on February 4, 2015, five days before the Merger Agreement was signed and after the economic terms and nearly all due diligence on the deal were finalized. The Complaint also acknowledges that Vector demanded that it be permitted to negotiate a new employment contract with Farshchi as a condition to entering into the transaction. The Complaint lacks any allegations that Farshchi engaged in any employment negotiations prior to this demand with any of the potential acquirors or that he was driven to take certain positions during the negotiations by a desire to be retained at the surviving company. This is unlike *In re Answers Corporation Shareholders Litigation*,[139] where plaintiffs alleged that the CEO would lose his job unless he sold the company,[140] or *In re Lear Corporation*

---

[138] Notably, Farshchi left the post-Merger company in July 2015, just months after the completion of the Merger.

[139] 2012 WL 1253072 (Del. Ch. Apr. 11, 2012).

[140] *Id.* at *7.

*Shareholder Litigation*,[141] where the CEO negotiating the transaction had a unique and personal need for liquidity that was not shared by all stockholders.[142] Farshchi shared the liquidity predicament caused by the pending deregistration of Saba's stock with all of Saba's stockholders. Therefore, I find that the Complaint does not support a reasonable inference that Farshchi was interested in the transaction for any reason other than the equity-related cash-out he received in connection with the Merger along with all other members of the Board.

＊＊＊＊＊＊＊＊＊＊＊＊＊

Having found that the Complaint supports a reasonable inference that the Board acted in bad faith and was interested in the transaction due to its extraction of merger-related compensation, the Individual Defendants' motion to dismiss Count I must be denied as the Complaint adequately states a claim for breach of the fiduciary duty of loyalty.

## C. Plaintiff Has Failed to Plead Aiding and Abetting Against Vector

The Vector Defendants move to dismiss Plaintiff's aiding and abetting claim both for failure to plead an underlying breach of fiduciary duty and for failing adequately to plead that Vector knowingly aided the Individual Defendants in any

---

[141] 926 A.2d 94 (Del. Ch. 2007).

[142] *Id.* at 100.

breach they may have committed, *i.e.,* scienter. I reject the first argument for the reasons stated above. I address the second argument below.

To state a claim for aiding and abetting a breach of fiduciary duty, the plaintiff must plead: "(1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in a breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary."[143] In order for a third party's actions to constitute knowing participation in a breach of fiduciary duty, that third party must "act with the knowledge that the conduct advocated or assisted constitutes such a breach."[144]

The Complaint alleges that the Vector Defendants knowingly aided and abetted the Board's breach of fiduciary duty by acquiring Saba at a price it knew was unfair and by unfairly leveraging its position as a Saba lender armed with confidential information that other Saba stockholders did not possess.[145] Plaintiff

---

[143] *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002) (quoting *Fitzgerald v. Cantor*, 1999 WL 182573, at *1 (Del. Ch. Mar. 25, 1999)). *See also Malpiede*, 780 A.2d at 1096 (same).

[144] *Id.* at 1097–98 (explaining that "[u]nder this standard, a bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting, whereas a bidder may be liable to the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the board. Similarly, a bidder may be liable to a target's stockholders for aiding and abetting a fiduciary breach by the target's board where the bidder and the board conspire in or agree to the fiduciary breach.") (citations omitted).

[145] *See* Compl. ¶ 129 ("Vector has worked with Saba since 2013, and is therefore, familiar with the Company's true value. . . . Accordingly, Vector had access to Saba's most recent and detailed financial information, information ordinary stockholders were unable to

correctly posits that an acquiror "may not knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders."[146] The rationale for this settled rule is that a bidder may not knowingly "[c]reat[e] or exploit[e] a fiduciary breach."[147] Plaintiff has pled no facts that would support a reasonable inference that Vector did anything of the sort here. And, while Plaintiff now argues that Vector used the confidential information it possessed to "push the Board to end the sales process quickly to assure the Merger Agreement would be executed before Saba's stockholders learned of the Company's favorable prospects,"[148] the Complaint is devoid of any such factual allegations.[149] Plaintiff cannot defeat an argument raised

access. Vector took advantage of the Individual Defendants' breaches to extract terms locking up the deal for itself and in order to acquire the Company at an unfair price."). *See also* Answering Br. 55–58.

[146] *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1058 (Del. Ch. 1984), *aff'd*, 575 A.2d 1131 (Del. 1990).

[147] *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 837 (Del. Ch. 2011).

[148] Answering Br. 56–57.

[149] *See* Compl. ¶¶ 23, 60, 67, 129. I note as well that Plaintiff has not identified specifically what these "favorable prospects" were, and that nothing in the Complaint or the Proxy identifies any favorable new developments with Saba's business or anticipated growth. Rather, Plaintiff seems to be attempting to invoke *In re Answers*, where the court refused to dismiss an aiding and abetting claim for failure to state a claim where the acquirors "used [confidential] information to push the Board to end the sales process quickly to assure the Merger Agreement would be executed before Answers' shareholders learned of the Company's favorable prospects." In that case, however, the acquirors had access to confidential information that allegedly showed an increase in operating and financial

65

in a motion to dismiss by proffering an after-the-fact theory for this first time in his answering brief.[150]

Moreover, "the receipt of confidential information, without more, will not usually be enough to plead a claim for aiding and abetting."[151] Likewise, conclusory allegations that a third party received "too good of a deal," without more, will also be insufficient to state a claim for aiding and abetting the breach of fiduciary duties.[152] Yet that is exactly what Plaintiff has pled here. Since the Complaint contains no well-pled allegations from which I can reasonably infer that the Vector Defendants "act[ed] with the knowledge" that their conduct during the sales process

---

performance that would likely increase the market price for the target company's stock above the acquirors' offer price. *In re Answers*, 2012 WL 1253072, at *9–10.

[150] *See OLL Ventures, Inc. v. Woodland Mills Assocs., L.P.*, 2001 WL 312452, at *1–2 (Del. Ch. Mar. 8, 2001) (refusing to consider an allegation not found in the complaint when addressing plaintiff's response to a motion to dismiss); *Dolphin Ltd. P'ship I, L.P. v. Gupta*, 2007 WL 315864, at *1 (Del. Ch. Jan. 22, 2007) (same); *Orman*, 794 A.2d at 28 n.59 ("Briefs relating to a motion to dismiss are not part of the record and any attempt contained within such documents to plead new facts or expand those contained in the complaint will not be considered.").

[151] *In re Answers*, 2012 WL 1253072, at *10.

[152] *Dent*, 2014 WL 2931180, at *18. *See also Morgan v. Cash*, 2010 WL 2803746, at *8 (Del. Ch. July 16, 2010) ("Under our law, both the bidder's board and the target's board have a duty to seek the best deal terms for their own corporations when they enter a merger agreement. To allow a plaintiff to state an aiding and abetting claim against a bidder simply by making a cursory allegation that the bidder got too good a deal is fundamentally inconsistent with the market principles with which our corporate law is designed to operate in tandem."); *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 735 (Del. Ch. 1999) ("[I]t should be obvious that 'an offeror may attempt to obtain the lowest possible price for stock through arm's-length negotiations.'"), *aff'd*, 757 A.2d 1278 (Del. 2000) (TABLE).

aided and abetted the Individual Defendants in any breach of fiduciary duty,[153] Count II of the Complaint must be dismissed.

## IV.   CONCLUSION

For the foregoing reasons, the Individual Defendants' motion to dismiss is DENIED, and the Vector Defendants' motion to dismiss is GRANTED.

**IT IS SO ORDERED.**

---

[153] *Malpiede*, 780 A.2d at 1097–98.